STATE of Missouri, Respondent,

v.

Charles B. **HORNBECK**, Appellant.

No. 57101.

Supreme Court of Missouri,
Division No. 2.

April 9, 1973.

803

John C. Danforth, Atty. Gen., Allan D. Seidel, Asst. Atty. Gen., Jefferson City, for respondent.

Daniel V. O'Brien, St. Louis, for appellant.

HOUSER, Commissioner.

This is an appeal by Charles B. Hornbeck from a judgment convicting him of burglary second degree and stealing, and sentencing him to concurrent terms of 6 and 2 years, respectively. The notice of appeal was filed prior to January 1, 1972.

Various items found in an automobile and seized by police, unsuccessfully sought to be suppressed by pretrial motion, were introduced in evidence against appellant, whose first point is that warrantless searches of (1) the glove compartment, (2) the trunk at the scene of the arrest, (3) the trunk at the police station, and (4) the

bags and pillows found in the trunk, and the seizure of the bags and pillows and the articles found in the bags and pillows, were without probable cause; that searches (2), (3) and (4) were each the fruit of the poisonous tree of the preceding illegal search or searches.

The State's evidence: During each of the three months preceding August 20, 1969 there were an estimated twenty-five residential burglaries in the area where the burglary in question occurred. There were approximately twenty burglaries during the first twenty days of August. On the evening of August 20 an informer reported to Rock Hill Police Department that an automobile had driven up and parked in front of a vacant house at 1212 Oak Leaf Drive, and that three men had left the vehicle, gone into the back yard of the vacant house and not returned in 20–25 minutes. At 8:15 p. m. Officer Westbrook was dispatched to investigate. He found a 1969 Oldsmobile parked in front of the vacant house. He checked with the informer and verified that the vehicle did not belong to any of the residents of the area. A license check revealed that the license plate on the Oldsmobile was registered to one Darlene A. Walker and that it had been issued for use on a 1967 Cadillac. Officer Johnstone arrived at the scene at 8:30 p. m. He testified that it was circulated information throughout the Rock Hill Police Department and among different police officers in the jurisdiction of St. Louis County that Darlene Walker was "associated with" appellant. According to Officer Ritchey this appellant had a prior record of burglary and larceny; was a known residential burglar, and was known to park his car in one part of town, walk to another area to commit burglaries, and then return to his car. The two officers conducted a search of the back yard of the vacant house, all around the house and the area, looking for the three men, and for evidence that the house had been entered. They found nothing; saw no one, and ascertained that no entry had been made. The officers returned to the Oldsmobile. Looking through the closed windows they saw on the floor boards two pairs of men's shoes, a flashlight and a man's wallet. The officers opened the doors of the vehicle and Officer Johnstone checked through the glove compartment. There he found a sales slip from a lumber company evidencing a sale of some lumber to appellant, and some papers with Darlene Walker's name on them. The wallet contained no money, cards or identification data. After finding the sales slip the officers disabled the Oldsmobile by opening the hood and removing a wire running from the coil to the distributor. Then they called the Ladue Police Department, requesting assistance in setting up surveillance of the car. (The two departments had a reciprocity contract to assist each other.) Officers Ritchey and Webber, responding, maintained surveillance for approximately four hours, parking their car 100 feet south of the Oldsmobile. At 12:30 a. m. they observed an individual coming out from behind the house at 1212 Oak Leaf Drive. He looked, paused momentarily, looked up and down the street, went to the trunk of the Oldsmobile, opened it, and stood there for a time. Two other men came running out. They threw what appeared to be white sacks and some satchels in the car trunk. All three men pulled off the top part of their garments (their jackets) and threw them in the trunk of the car. One man went to the driver's side of the car and the other two entered on the other side. The officers moved forward on foot. The dome light in the car was on and Officer Ritchey recognized appellant. The officers reached the Oldsmobile as appellant, after unsuccessfully trying to start the car, opened the front door, put his foot on the ground and looked up and down the street. Officer Ritchey ordered appellant out of the car, but did not place him under arrest immediately. He approached the subjects and asked appellant what he was doing in the area. Appellant "wouldn't answer any questions at this time." The subjects were then placed under arrest on suspicion of

burglary, advised of their rights and handcuffed. At that time the officers did not know that any burglary had been committed in the area that night. The officer asked appellant if he minded if the officer looked in the auto trunk, asking, "Do I have your permission?," to which appellant replied that the keys were on the front seat; that "You are going to look anyway." Officer Ritchey found the keys on the front seat and opened the trunk in the presence of Officer Webber and the three suspects. A call was made for assistance. Officers Coffman and Masters and three officers from the Rock Hill Police Department arrived. Some bags full of articles and a gun in a case were observed in the trunk but were not then removed or closely inspected. After observing the articles in the trunk the trunk door was closed. The suspects were taken to the police station and the car towed to the police station, where the trunk was reopened, and the items in the trunk photographed, removed and inventoried. Jewelry, silverware, some guns and papers were found in pillow cases and satchels. There was a .25 calibre automatic pistol and a shotgun in a leather case. Other articles found included two half-length fur stoles; flashlights, three screwdrivers, jersey gloves, walkie-talkie radios; some extra license plates; one luggage tag; two candelabra; one medallion; one silver bowl. At that time the officers still had no knowledge of any burglary. From names and addresses found among the items the officers went to two addresses in the area. At 3:30 a. m. they discovered an open window at the home of the Raybucks in Rolling Rock Lane; the locking device had been punched off. There was other evidence that the house had been entered. The Raybucks later identified the goods found in the trunk as their property. 1212 Oak Leaf Drive is one and a fourth miles from 22 Rolling Rock Lane by direct line; about three and a half miles by car.

■ Appellant first contends that the search of the glove compartment of the Oldsmobile without a warrant, and not as an incident to an arrest, was a "blatantly impermissible 'general exploratory search in the hope that evidence of crime might be found,'" and that all of the following police activity including the ultimate seizure of the stolen goods was "fruit of the poisonous tree" of the original search of the glove compartment. Appellant concedes that under State v. Speed, 458 S.W. 2d 301 (Mo.1970) and federal authorities citited therein, the search of an automobile, even though not incident to an arrest, may be constitutionally permissible if there is probable cause for the search. Under these authorities probable cause means more than mere suspicion, but exists where the facts and circumstances within the knowledge of the seizing officers, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed or that the contents of the automobile offend against the law.

■ Probable cause existed for the search of the glove compartment. The recited facts gave rise to a reasonable belief that an offense had been committed under § 301.140, subd. 1,[1] relating to removal of license plates on transfer or sale of motor vehicles, or under § 301.150, subd. 3, relating to fastening of voided plates on motor vehicles (for violation of which sections criminal penalties are provided by § 301.-440), or that the vehicle was a stolen car, or that the vehicle was being used in the commission of a felony. The facts and circumstances provided a legitimate reason for the police to inquire further with respect to the use of the license plates; the ownership of the Oldsmobile and whether it was being used as an instrumentality in the commission of a crime; and the identity, whereabouts and doings of the three persons who left the automobile and vanished from the scene. The officers were justified in opening the glove compartment without a search warrant for these pur-

---

1. Section numbers refer to RSMo 1969, V.A.M.S.

poses: to attempt to ascertain the identity of the owner of the Oldsmobile, Workman v. Cardwell, 338 F.Supp. 893 (N.D.Ohio 1972),[2] or of the person or persons using the car; to attempt to ascertain the identity and activities of the persons who had mysteriously disappeared; to answer questions legitimately raised by the apparently unauthorized use of the license plates; and, in view of the intention of the police to place the Oldsmobile under surveillance in the hope of intercepting the three men for questioning if and when they returned to the scene, the police for their own protection were justified in searching the glove compartment to be certain there were no weapons concealed therein which might be used against the police when they confronted the men upon their reentry of the automobile.

Next, appellant would impeach the search of the Oldsmobile at the scene on the ground that the warrantless search of the trunk was not incident to a lawful arrest; that there was no probable cause for arrest; that the informant was not shown to have been a credible, reliable, prudent person; that none of the officers had any information that any burglary had been committed on that evening; that the contention that appellant was a known residential burglar "is but a bald and unilluminating assertion of suspicion," entitled to no weight in deciding probable cause; that what the officers saw immediately prior to arrest could not create a reasonable belief that appellant had committed a burglary; and that at most the doings of appellant and associates amounted to nothing more than suspicious activity.

■■ The facts and circumstances justified the officers in making an immediate search of the automobile without a warrant. Although they had no knowledge of the commission of a burglary that evening they knew these facts: that numerous burglaries had been committed in that immediate area during the preceding three months; that a strange car, bearing license plates issued for use on another automobile, had been parked at night in front of a vacant house; that three men left the car and disappeared in the neighborhood, after traversing the yard of the unmolested vacant house; that appellant had some connection with the car or the person in whose name the license plate was registered, and that appellant was a known residential burglar whose *modus operandi* was to park his car in one area, burglarize another area on foot, and then return to the vehicle with the stolen property. The fact that appellant was a known police character was a factor which the officers could properly weigh in making their determination. State v. Kelley, 473 S.W.2d 707, 710 [2] (Mo.1971). They knew that at half an hour after midnight, after sufficient time had elapsed within which to commit a burglary elsewhere and return to the Oldsmobile, three men whose actions were furtive, stealthy and highly suspicious, appeared out of the darkness from the yard of the vacant house; that one of them, after taking precautions not to be seen, opened the car trunk, whereupon two others carrying sacks and satchels appeared out of the yard and placed their burdens in the car trunk; that all three men removed their jackets and threw them in the trunk; that when intercepted by the officers as they attempted to leave the scene and subjected to routine questioning they refused to give an account of themselves. The facts known to the officers, which would seem to defy innocent explanation of the activity of the three men, warranted the officers in the reasonable belief "that a crime was

2. "Beyond question, an officer trained in his duties would have reason to believe that the registration certificate might be found in the glove compartment." Kendrick v. Nelson, 448 F.2d 25, 27, (9th Cir. 1971). "[N]otice [that the license plate was registered to another car and owner] * * * required a search of the car to find the ownership papers at the least." United States v. Jackson, 429 F.2d 1368, 1371 (7th Cir. 1970).

being committed before their eyes,"[3] and that the trunk contained the fruits of a burglary, so that the automobile offended against the law. There was reasonable cause for the arrest of the appellant on suspicion of burglary. A warrantless arrest was justified. The warrantless search of the trunk was justified as an incident to a lawful arrest. Even without the arrest the officers would have been justified in searching the Oldsmobile without a warrant.[3]

◼ Appellant asserts that if the arrest was valid the contemporaneous search of the trunk was not reasonably incident thereto in time, place or scope; that it was made when the three subjects connected with the vehicle were handcuffed and in custody, kneeling in the street before the officers, the Oldsmobile disabled and inoperable; that no search of the trunk was necessary to remove weapons that might be used against the officers, or to prevent the concealment, destruction or removal of evidentiary items; that there was time and it was practicable to procure a search warrant. Given probable cause to search the automobile the officers were permitted to carry out an immediate search without presenting the probable cause issue to a magistrate. Chambers v. Maroney, 399 U. S. 42, 51, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). In State v. Edmonds, 462 S.W.2d 782, 784 (Mo.1971), this Court followed the Chambers v. Maroney holding, applicable here, that the right to search an automobile and the validity of a seizure are not dependent upon the right to arrest but depend upon the existence of reasonable cause on the part of the seizing officer to believe that the contents of the automobile offend against the law.

◼ Appellant complains that the arrest was illegal because the officers of Ladue Police Department had no jurisdiction outside the boundaries of Ladue to make felony arrests for probable cause in the City of Rock Hill. This issue, sought to be raised for the first time on appeal, and never having been raised at any prior stage of the proceedings, has not been preserved for appellate review. Rowden v. Amick, 434 S.W.2d 550, 552 (Mo.1968).

◼ Appellant claims that the warrantless search of the trunk and seizure of its contents at the police station were the fruit of the poisonous tree of the prior illegal searches, but if both prior searches were legal the search and seizure at the police station were without probable cause; that the latter search was not reasonably incident to the arrests on Oak View Drive; that the police had no information that a burglary had occurred, could not have stated in an application for a search warrant the required specific description of property to be searched for and therefore did not know *what* they were looking for; that the Oldsmobile had been immobilized and its occupants placed in custody inside the police station; that there was no emergency, and that there was ample time to procure a search warrant. Because of the similarity of the facts on this issue to those in Chambers v. Maroney, supra (in which the Supreme Court indicated that the probable cause factor still obtained at the station house) we rule this point against appellant.

◼ Appellant further asserts the invalidity of the warrantless search of the bags and pillow cases and seizure of their contents, on the ground of lack of probable cause because, again, they were not reasonably incident in time, place or scope to a lawful arrest; that there was no probable cause to search the bags and sacks; that it was a general exploratory search, and that it was practicable to seek a warrant. This search and seizure was valid for the reasons given and under the authorities cited in approving the previous searches and seizures. See State v. Ward, 457 S.W.2d 701

3. United States v. Wabnik, 444 F.2d 203 (2nd Cir. 1971) and case cited l. c. 205, cert. den. 404 U.S. 851, 92 S.Ct. 88, 30 L.Ed.2d 91.

(Mo.1970); State v. Novak, 428 S.W.2d 585 (Mo.1968).

In addition to the lack of merit in appellant's position on the merits of the search and seizure questions, appellant has not sustained the burden of showing that he has standing to raise these questions. The first essential prerequisite in challenging incriminating evidence seized in an allegedly unlawful search is that the person invoking the constitutional limitations on searches and seizures must have "standing" to raise the question. On a motion to suppress evidence movant has the burden of presenting evidence to sustain his contentions.[4] Movant has the burden of affirmatively demonstrating the illegality of the search and seizure.[5] One of the elements of that presentation is the matter of standing which accused must establish by proof, if as in this case his standing is not conceded or established by evidence introduced by the State. "The record is devoid of evidence indicating any interest, ownership or otherwise, of [appellant] in the [Oldsmobile] such as to afford him standing to complain of its search. Only one whose Fourth Amendment right of privacy has been violated may object to the introduction of the fruits of an illegal search. [Citing cases.]" Cassady v. United States, 410 F.2d 379, 380 (5th Cir. 1969).

Appellant's second point is that his constitutional right to remain silent was invaded by the court's ruling on an objection to an answer given by the arresting officer to a question asked by the prosecuting attorney on direct examination. Appellant invokes the rule discussed in State v. Yager, 416 S.W.2d 170, 172 (Mo.1967); State v. Phelps, 384 S.W.2d 616 (Mo.1964); State v. Vainikos, 366 S.W.2d 423, 427 (Mo. banc 1963) and State v. Dowling, 348 Mo. 589, 154 S.W.2d 749 (1941), that the silence of a person under arrest who is accused of and is being interrogated about a crime, or in whose presence statements about a crime are made, may not be shown in evidence, because he is under no duty to speak.

The question and answer followed testimony that appellant stepped out of the Oldsmobile on order of the officer, after appellant had unsuccessfully attempted to start the car. The question was, "What, if anything, happened next?" The answer, "I approached the subjects, asked the defendant what he was doing in the area. He wouldn't answer any questions at this time. I told him he was under—" Objection on the ground that this answer was highly prejudicial and objectionable and motion for mistrial was overruled.

The rule invoked is inapplicable. Silence of the accused when not under arrest, and in circumstances where only a guilty person would remain silent, may be shown. State v. Woods, 434 S.W.2d 465, 468 [2] (Mo.1968); State v. Phelps, 384 S.W.2d 616, 621 (Mo.1964). In this case there was a duty to speak; a duty to answer the officer's legitimate inquiry made in the course of a routine investigation, prior to arrest. Appellant's failure to respond was properly shown as evidence of guilt. There was no error in overruling the mistrial motion.

Appellant's third point is that the court erred in overruling an objection and motion for mistrial during the prosecuting attorney's final argument to the jury when he said, "I say to you that all of this information and what all this stands for is a first-rate professional job, a job with people who know what they are doing and you can infer—." Appellant equates "professional job" with "professional burglar" and asserts that the prosecutor's words consti-

---

4. State v. Stuart, 415 S.W.2d 766 (Mo. 1967); State v. Holt, 415 S.W.2d 761 (Mo.1967).

5. State v. Hepperman, 349 Mo. 681, 162 S.W.2d 878 (1942).

tuted the use of denunciatory personal epithets aimed at the character of appellant by referring to him as a professional burglar; and that his character had not been put in issue. Appellant cites cases where convictions were reversed for calling the defendant a moral pervert; a dirty, low-down hound and scoundrel; serpent; police character; loafer; infamous, lecherous scoundrel; low and contemptible brute, unworthy of the respect of the community; sugar-loaved, squirrel-headed Dutchman; mean, low-down, wicked, dirty devil; vicious killer, etc. These situations are not analogous. A reading of the entire closing argument of the State in the light of the argument of defense counsel which preceded it leads to the conclusion that the court did not abuse its discretion in this case. The prosecutor was trying to persuade the jury that inferences other than those suggested by defense counsel could be drawn from the evidence. Defense counsel had argued that from the absence of mud on the floors of the burglarized home and the fact that all three men were covered with mud when arrested the jury could infer that the three men had not entered the burglarized home. Immediately preceding the above-quoted statement of the prosecutor he had suggested that the jury could infer that this was a heavily grassed area, with grass all around the house and an asphalt driveway; that the easiest, most accessible area for entry was through the window "if you know what you are doing," and then asked "How come no mud on any of that floor? I say to you, * * *" etc. We cannot say that the suggested inference was not reasonable or that the description of the job was not a legitimate comment upon the evidence. The prosecutor called the job what from the evidence it reasonably appeared to him to be: a professional job. It was not necessarily an opprobrious epithet hurled at appellant. We construe the remark as a legitimate characterization of the burglary and not a personal castigation of appellant.

No error appearing the judgment is affirmed.

STOCKARD, C., concurs.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the Court.

All of the Judges concur.